**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

VAMOS, CONCERTACIÓN CIUDADANA,
INC., *et al.*,

    **Plaintiffs,**

        **v.**

COMMONWEALTH OF PUERTO RICO,
*et al.*,

    **Defendants.**

**Civil No.** 20-1426 (FAB)

**OPINION AND ORDER**

BESOSA, District Judge.

    Plaintiffs VAMOS, Concertación Ciudadana, Inc. ("VAMOS"), María de Lourdes Guzmán-Rivera, Justo Méndez-Aramburu, Rubén Colón-Morales, Raquel González-Sparks, Jesús Danilo Chinea-Rivera, Pedro Muñiz-García, Ineabelle Colón-Rivera, José González-Gierbolini, Alice Sparks-Horner, José Rodríguez-Báez, Enrique José Estrada-Carrau, and Eliza Llensa-Zuecca (collectively, "plaintiffs") request declaratory and injunctive relief against defendants Commonwealth of Puerto Rico ("Commonwealth"), the State Electoral Commission ("CEE," for its Spanish acronym), the Office of Electoral Comptroller, Francisco Rosado-Colomer ("Rosado") in his official capacity as Chairman of the CEE,[1] Juan Dávila-Rivera

_____

[1] Plaintiffs originally named Juan Dávila-Rivera as a defendant in his personal capacity and in his official capacity as Chairman of the CEE. (Docket No. 1.) After Francisco Rosado-Colomer took over the position, the Court ordered him substituted for Juan Dávila-Rivera only in his official capacity. (Docket No. 16.)

("Dávila") in his personal capacity, and Walter Vélez ("Vélez") in his personal capacity and in his official capacity as Comptroller of the Office of the Electoral Comptroller (collectively, "defendants") from enforcing Article 6 and sections 7.1(d) and 8.3(a) of the Act to Define Puerto Rico's Ultimate Political Status, Act No. 51-2020 ("Act 51"). (Docket No. 1.) Plaintiffs have also moved for a temporary restraining order and preliminary and permanent injunctions against the defendants to enjoin them from enforcing those provisions. (Docket Nos. 12-13.) Defendants moved to dismiss the claims, and the plaintiffs replied. (Docket Nos. 27, 33, 38-39 & 44.)

For the reasons set forth below, the plaintiffs' request for permanent injunctive relief, (Docket No. 13,) is **GRANTED IN PART AND DENIED IN PART**. Rosado and Vélez are **PERMANENTLY ENJOINED** from enforcing article 6, section 7.1(d), and a portion of section 8.3(a) of Act 51. The motions for a temporary restraining order and for preliminary injunctive relief, (Docket Nos. 12-13,) are **VACATED AS MOOT**. The defendants' motions to dismiss, (Docket Nos. 27, 33,) are **GRANTED IN PART AND DENIED IN PART**. All causes of action against the Commonwealth of Puerto Rico, the CEE, and the Office of the Electoral Comptroller are **DISMISSED WITHOUT PREJUDICE**. The claims made directly pursuant to the Federal Constitution against Rosado and Vélez in their official capacities

are **DISMISSED WITH PREJUDICE**, while the claims made directly pursuant to the Puerto Rico Constitution against Rosado and Vélez in their official capacities are **DISMISSED WITHOUT PREJUDICE**.  The claims pursuant to section 1983 and directly pursuant to the Federal Constitution against Vélez and Dávila in their personal capacities are **DISMISSED WITH PREJUDICE**, while the claims directly pursuant to the Puerto Rico Constitution against Vélez and Dávila in their personal capacities are **DISMISSED WITHOUT PREJUDICE.**

**I.   Background**

   **A.   Factual Background**

        The United States Constitution authorizes Congress to admit new states.  U.S. Const. art. IV, § 3, cl. 1 ("New States may be admitted by the Congress into this Union.").  Thirty-seven states have been admitted, and eleven states readmitted, since ratification of the Constitution.  Eric Biber, <u>The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union</u>, 46 Am. J. Legal Hist. 119, 125 (2004).

        The admission of new states has followed a general process.  <u>Id.</u>  Support for statehood from a majority of the population in a would-be state has historically been an important factor in the process.  <u>Id.</u> at 127.

        Puerto Ricans have voted five times in the past half-century on their preference for political organization.  Samuel

Issacharoff *et al.*, What Is Puerto Rico?, 94 Ind. L.J. 1, 2 (2019).
In 2012 and 2017, Puerto Ricans overwhelmingly voted in support of
statehood.  Tom C.W. Lin, Americans, Almost and Forgotten, 107
Calif. L. Rev. 1249, 1289 (2019).  After the referendums, no
meaningful progress in Congress occurred.  Id. at 1289–90.

On May 16, 2020, the Governor of Puerto Rico signed into
law a measure known as "Act 51" and entitled "Act to Define Puerto
Rico's Ultimate Political Status."  Act 51 requires a referendum
to be held on November 3, 2020, the same day as the general
election, regarding whether Puerto Rico should become the 51st
state of the United States of America.  Act 51 § 2.1.  The
referendum will ask one question: "Should Puerto Rico be admitted
immediately into the Union as a State?".  Id. § 4.1.

Act 51 also includes rules and requirements pertaining
to the campaign associated with the referendum.  See id. arts. 6–
7.  It also instructs that challenges seeking a stay of the
referendum must be brought in the Puerto Rico Supreme Court.  Id.
§ 8.3(a).  Some of these provisions are the subject of the
plaintiffs' action.

### B.   Procedural Background

Plaintiffs commenced this action on August 19, 2020.
(Docket No. 1.)  That is three months after the Puerto Rico
legislature enacted Act 51.  Then, twenty days later, plaintiffs

moved for a temporary restraining order and for preliminary and permanent injunctions.  (Docket Nos. 12-13.)

Defendants moved to dismiss and opposed equitable relief on September 18, 2020.   (Docket Nos. 27-28, 33, 35, 38-39.) Defendants met the deadline set by this Court.  See Docket No. 24.

Plaintiffs' deadline to reply to or otherwise oppose any of the defendants' motions or filings was September 21.  Id. On that date, plaintiffs sought an extension.  (Docket No. 36.)  The Court granted the extension.  (Docket No. 37.)  Plaintiffs finally made their filing on September 23, 2020.[2]  (Docket No. 44.)

## II.  Justiciability

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress . . . ."  Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).  The Court cannot turn to the merits of plaintiffs' complaint without ensuring itself that it has power to adjudicate the claims.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 98-102 (1998).

---

[2] The plaintiffs' repeated delays in the context of an imminent election raises questions about the urgency of their requests for equitable relief.  See, e.g., Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) ("[D]elay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm.").  Swift and prompt litigation is necessary in injunctive actions to protect the movants' rights.  This is particularly true here, because the referendum is set to occur just over a month from the date of this Opinion and Order.

The following pages in this section may seem complex, but "[m]uch more than legal niceties are at stake here." Id. at 101. The limits on federal courts' jurisdiction are necessary to, among other things, the independence of state and territorial governments and the separation of powers within the federal government. Id.; Victory Carriers, Inc. v. Law, 404 U.S. 202, 212 (1971).

To help the reader, here is a preview of this section. Most of the plaintiffs' claims will be dismissed because they are not justiciable. The only claims that survive this section are the claims pursuant to 42 U.S.C. section 1983 concerning violations of the Federal Constitution against Rosado and Vélez in their official capacities. This table also summarizes the analysis in this section:

**[Continued on Next Page]**

| Parties | Bases of Claims | Action | Reason |
|---------|-----------------|--------|--------|
| Commonwealth of Puerto Rico, CEE, and Office of the Electoral Comptroller | Section 1983, Federal Constitution, and Puerto Rico Constitution | Dismissed without prejudice | Immunity |
| Rosado and Vélez in official capacities | Section 1983 | Not dismissed | Justiciable |
| Rosado and Vélez in official capacities | Federal Constitution | Dismissed with prejudice | Claims can be vindicated through section 1983 |
| Rosado in official capacity, Dávila in personal capacity, and Vélez in official and personal capacities | Puerto Rico Constitution | Dismissed without prejudice | No supplemental jurisdiction |
| Dávila and Vélez in personal capacities | Section 1983 and Federal Constitution | Dismissed with prejudice | Equitable relief unobtainable |

## A.    Claims Against the Commonwealth of Puerto Rico

Federal courts have limited authority in suits against state governments.  States are immune from suits in federal court brought by their own citizens.  Hans v. Louisiana, 134 U.S. 1, 20-21 (1890).  The Commonwealth of Puerto Rico is treated like a state for these purposes.  Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. González-Feliciano, 695 F.3d 83, 102 n.15 (1st Cir. 2012).  This immunity is derived from long-existing principles of sovereign immunity, and the Eleventh Amendment is "an exemplification" of the principles.  Ex parte New York, 256 U.S.

490, 497 (1921).  The "jurisdictional bar applies regardless of the nature of the relief sought." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  A state may consent to suit, but only "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." Edelman v. Jordan, 415 U.S. 651, 673 (1974) (alteration in original) (internal quotation marks omitted).

States are also not suable persons pursuant to section 1983. Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 201 (1991); Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989); Brown v. Newberger, 291 F.3d 89, 92 (1st Cir. 2002); López-Acosta v. Toledo, Civ. No. 06-2193, 2009 WL 10719749, at *5 n.8 (D.P.R. Feb. 9, 2009) (Delgado-Colón, J.).  The Commonwealth of Puerto Rico is treated like a state for purposes of whether it is a person suable pursuant to section 1983. Rosario-Urdaz v. Rivera-Hernández, 350 F.3d 219, 222 (1st Cir. 2003).  The reasons for this rule include the balance between the federal government and state governments and the pedigree of states' sovereign immunity. Will, 491 U.S. at 64-67.

Surprisingly, in this case, the Commonwealth of Puerto Rico raises neither its Eleventh Amendment immunity nor its section 1983 suability. See Docket No. 33.  This raises the

question of whether the Commonwealth has waived the immunity defense or otherwise consented to suit.

A party does not waive an Eleventh Amendment immunity defense by failing to raise it at the outset of a proceeding, and courts may *sua sponte* consider the defense because Eleventh Amendment immunity is a limitation on the Court's subject matter jurisdiction. Reese v. Michigan, Civ. No. 99-1173, 2000 WL 1647923, at *2 (6th Cir. Oct. 24, 2000) (*per curiam*); Plain Local Sch. Dist. Bd. Of Educ. v. DeWine, Civ. No. 19-5086, 2020 WL 5521310, at *9 (S.D. Ohio Sep. 11, 2020). Additionally, courts presume that a state has not consented to waive its immunity. College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 682 (1999).

In light of those rules, all claims against the Commonwealth of Puerto Rico fail. The Commonwealth is entitled to immunity, González-Feliciano, 695 F.3d at 102 n.15, and there is no indication in the record of a waiver of that immunity, Edelman, 415 U.S. at 673; Reese, 2000 WL 1647923, at *2. Therefore, all claims against the Commonwealth are **DISMISSED WITHOUT PREJUDICE.**

Plaintiffs allege that the Commonwealth of Puerto Rico is an indispensable party in this case. (Docket No. 1 at p. 5.) As just noted, all claims against the Commonwealth of Puerto Rico are dismissed. If plaintiffs were correct about indispensability,

the Court would be required to dismiss plaintiffs' action.  See
Fed. R. Civ. P. 19(b).  Fortunately for plaintiffs, they are
incorrect.  The Commonwealth is not indispensable because, among
other reasons, the other defendants (two governmental officials in
their  official  capacities)  can  protect  the  Commonwealth's
interests, and equity demands the Court not dismiss the case.
Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 18-19 (1st Cir. 2008);
Gallagher v. N.Y. State Bd. Of Elections, Civ. No. 20-5504, 2020
WL 4496849, at *11-13 (S.D.N.Y. Aug. 3, 2020).

**B.   Claims Against the CEE and the Office of the Electoral
       Comptroller**

Some  state  and  territorial  agencies  share  in  the
Eleventh Amendment immunity of their state or territory.  An agency
is immune if it is an "arm of the state."  Pastrana-Torres v.
Corporación de P.R. Para La Difusión Pública, 460 F.3d 124, 126
(1st Cir. 2006); see Pennhurst, 465 U.S. at 100.  The issue of
whether an agency is an arm of the state is governed by the "twin
goals of the Eleventh Amendment—protection of the state's treasury
and  of  its  dignitary  interests."    Fresenius  Med.  Care
Cardiovascular Res., Inc. v. P.R. & The Caribbean Cardiovascular
Ctr. Corp., 322 F.3d 56, 63 (1st Cir. 2003).

In the first circuit, there are two component questions
to determining whether an agency is an arm of the state.  Pastrana-

Torres, 460 F.3d at 126.  The first question is "whether the state has structured the entity to share its Eleventh Amendment immunity."  Id.  "If the relevant indicia conclusively demonstrate that it has, Eleventh Amendment immunity applies."  Id.  If not, "the second part of the test focuses on the risk that money damages will be paid from the state's treasury if the entity is found liable.  This analysis centers on whether the state has obligated itself to pay the entity's debts."  Id. (citation omitted).  That question can be answered in the affirmative based on either express provisions of law or historical practice.  See id. at 128; Fresenius, 322 F.3d at 72.  If the second question is answered in the affirmative, the agency is immune.  Pastrana-Torres, 460 F.3d at 126.

In Pastrana-Torres, the First Circuit Court of Appeals examined whether the Corporación de Puerto Rico Para La Difusión Pública ("WIPR"), Puerto Rico's public broadcasting company, was an arm of the Commonwealth.  Id. at 125.  The Pastrana-Torres court noted structural factors pointing away and towards an intention to share immunity, and could not conclude that the Commonwealth structured WIPR to share its sovereignty.  Id. at 126-27.  The Pastrana-Torres court then considered whether the Commonwealth was obligated to pay WIPR's debts.  Id. at 127-28.  The Pastrana-Torres court explained that even though "WIPR's enabling act does

not explicitly obligate the Commonwealth to pay WIPR's debts. . . . the Commonwealth may have assumed this obligation by binding itself to provide virtually all of the funds that WIPR needs to operate." Id. at 128. The Pastrana-Torres court concluded that the Commonwealth had not assumed the obligation pay WIPR's debts because WIPR raised its own revenue and the Commonwealth only paid for shortfalls in the budget. Id.

In Fresenius, the court concluded that the Puerto Rico and the Caribbean Cardiovascular Center Corp. ("PRCCCC") was not an arm of the state. 322 F.3d at 59. Like the Pastrana-Torres court, the Fresenius court was unable to conclude that the Commonwealth structured PRCCCC to be an arm of the state. Id. at 72. Examining PRCCCC's funding, the Fresenius court held that the Commonwealth's treasury would not be obligated to pay a judgment against PRCCCC. Id. The Fresenius court determined that the Commonwealth, as a matter of law and practice, did not obligate itself to pay PRCCCC's debts. Id. "Rather, the Commonwealth has left itself free to provide or not provide funds to PRCCCC as it sees fit" and "provided for PRCCCC to have independent sources of revenue and, indeed, the majority of PRCCCC's funding now comes from sources other than the Commonwealth's treasury." Id.

This Court concludes that the CEE and the Office of the Electoral Comptroller are arms of the state. It is not necessary

to determine whether the Commonwealth structured the two agencies
to be arms of the government because, even if the answer to this
question is inconclusive, the Commonwealth has obligated itself to
pay the agencies' debts.  The enabling statutes of both agencies
state that the Commonwealth of Puerto Rico will fund their
operations.   P.R.  Laws  Ann.  tit. 16,  § 622h;  Act  No. 58
§§ 3.1(3)(a)-(e).[3]   If necessary, the Commonwealth commits to
provide additional resources to the Office of the Electoral
Comptroller.  Id. § 622h.  The governor and legislature are obliged
to provide additional resources to the CEE during election years.
Act No. 58 § 3.1(3)(f).  It is true that CEE is authorized to
solicit and receive donations to strengthen its technological
innovation, id. § 3.1(3)(g), but the magnitude of the government's
commitment to funding the agency is sufficient to render it an arm
of the state.

        Like the Commonwealth, the CEE and the Office of the
Electoral Comptroller do not assert Eleventh Amendment immunity.
See Docket Nos. 27, 33; cf. Docket No. 27 at pp. 8-10 (discussing
Eleventh Amendment without asserting immunity).  As the Court has

---

[3] The Puerto Rico legislature amended the Election Code on June 20, 2020.  Act.
No. 58-2020 (June 20, 2020).  An official translation of the amended statute is
not available.  The parties do not cite Act No. 58 in their recent filings, nor
do they argue that the amendments are material to this action.  A review of the
unofficial transcript is "somewhat imprecise," but demonstrates that the
amendments do not alter the Court's analysis.  Sindicato Puertorriqueño de
Trabajadores v. Fortuño, 699 F.3d 1, 5 n.2 (1st Cir. 2012).

done with respect to the Commonwealth, the Court considers the issue of Eleventh Amendment immunity *sua sponte*. Because the two agencies are arms of the Commonwealth, all claims against them are **DISMISSED WITHOUT PREJUDICE.**

### C. Claims Against State Officials in Their Personal and Official Capacities

The Court now turns to the remaining claims, which are brought against three officials—Rosado in his official capacity, Dávila in his personal capacity, and Vélez in his personal and official capacities. (Docket Nos. 1, 16.)  The plaintiffs' claims, along with their motions for equitable relief, seek declarations, injunctions, and a temporary restraining order concerning violations of the Federal and Puerto Rico Constitutions.  (Docket Nos. 1, 12–13.)

Claims against state officials are generally barred if "the state is the real, substantial party in interest." Pennhurst, 465 U.S. at 101 (internal quotation marks omitted).  There is an exception to that general rule for a suit challenging the constitutionality of a state official's action.  Id. at 102; see Ex parte Young, 209 U.S. 123, 160 (1908).  Pursuant to the exception, federal courts may award declaratory relief or an injunction that governs an official's future conduct.  Pennhurst, 465 U.S. at 102–03; Vaquería Tres Monjitas, Inc. v. Irizarry, 587

F.3d 464, 478 (1st Cir. 2009).

     The Court first addresses the claims against the officials pursuant to federal law.  The equitable relief plaintiffs seek can only be obtained from those individuals in their official capacities.  Feit v. Ward, 886 F.2d 848, 858 (7th Cir. 1989); Corsi v. Mueller, 422 F. Supp. 3d 51, 68-69 (D.D.C. 2019); cf. R.I. Dep't of Envtl. Mgmt. v. United States, 304 F.3d 31, 41 (1st Cir. 2002) ("[O]ur courts have long recognized that federal officers may be sued in their official capacity for prospective injunctive relief to prevent ongoing or future infringements of federal rights.").  As such, the claims pursuant to section 1983 and the claims directly pursuant to the Federal Constitution against Vélez and Dávila in their personal capacities are **DISMISSED WITH PREJUDICE.**

     The only remaining claims based on federal law are against Rosado and Vélez in their official capacities.  Some of those claims are made pursuant to section 1983 and concern the Federal Constitution.  As federal law creates the cause of action, there is federal subject matter jurisdiction for these claims pursuant to 28 U.S.C. § 1331.  Gunn v. Minton, 568 U.S. 251, 257 (2013).

     Plaintiffs also make federal claims against Rosado and Vélez in their official capacities directly pursuant to the Federal Constitution (rather than through section 1983).  See Docket

No. 1.   Where, as here, section 1983 provides a means to seek
vindication of those same rights, courts do not usually consider
claims directly implied from the Constitution.  See Jett v. Dallas
Indep. Sch. Dist., 491 U.S. 701, 731-35 (1989); Wax 'n Works v.
City of St. Paul, 213 F.3d 1016, 1019 (8th Cir. 2000); Baxter by
Baxter v. Vigo Cty. Sch. Corp., 26 F.3d 728, 732 n.3 (7th Cir.
1994), superseded by statute on other grounds as stated in Holmes
v. Marion Cty. Office of Family & Children, 349 F.3d 914, 918 (7th
Cir. 2003).   The claims made directly pursuant to the Federal
Constitution against Rosado and Vélez in their official capacities
are **DISMISSED WITH PREJUDICE.**

        Other claims against the officials in their personal and
official capacities seek injunctive and declaratory relief based
on the Puerto Rico Constitution.  (Docket No. 1.)  Plaintiffs ask
the Court to assert supplemental jurisdiction over these claims.
Id. at p. 2.  This Court may not exercise supplemental jurisdiction
over those equitable claims because they allege that "state
officials violated state law in carrying out their official
responsibilities."  Pennhurst, 465 U.S. at 121; see Guillemard-
Ginorio v. Contreras-Gómez, 585 F.3d 508, 529-30 (1st Cir. 2009).
Thus, the claims against Rosado, Dávila, and Vélez based on Puerto

Rico law are **DISMISSED WITHOUT PREJUDICE**.[4]

      The careful reader will observe that there are only two claims remaining.  Those are the claims pursuant to section 1983 concerning violations of the Federal Constitution against Rosado and Vélez in their official capacities.

    **D.**    **Standing**

      To press a claim in federal court, a litigant must have standing to do so.  This is because the Constitution restricts federal courts to consideration of cases and controversies.  U.S. Const. Art. III, § 2; Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).

      "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit, although that inquiry often turns on the nature and source of the claim asserted." Raines v. Byrd, 521 U.S. 811, 818 (1997) (internal quotation marks omitted). "[T]he party seeking to invoke the court's jurisdiction (normally, the plaintiff)" must have "a 'personal stake in the outcome' of

---

[4] Notwithstanding the Pennhurst doctrine, the Court would still decline to exercise supplemental jurisdiction over the claims based on Puerto Rico law. To the extent the plaintiffs wish to assert that the constitutional rights in the Puerto Rico Constitution have a different scope or effect than their counterparts in the Federal Constitution, the claims raise novel or complex issues of state law.  28 U.S.C. § 1367(c)(1).  The circumstances are also exceptional and present compelling reasons for declining jurisdiction, id. § 1367(c)(4), because plaintiffs provide absolutely no supporting argument on a distinct scope or effect of the Puerto Rico constitutional provision, and the short timeline of this case does not allow the Court to properly address the issues.

the claim asserted." Pagán v. Calderón, 448 F.3d 16, 27 (1st Cir. 2006) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

To demonstrate standing, a plaintiff must show an injury in fact that is both caused by a defendant's challenged action and likely redressable by a favorable judicial decision. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016). Put differently,

> To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)).

Plaintiffs are an organization[5] and twelve individuals. Plaintiffs have the intent and interest in campaigning associated with the referendum. (Docket No. 1 at pp. 3–5, 13; Docket No. 13, Exs. 2–11.) Plaintiffs wish to contribute their efforts to the campaign, contribute or collect funds, and participate in educational activities. (Docket No. 13, Exs. 2–11.)

---

[5] The First Amendment protections of free speech and association extend to organizations. See Citizens United v. FEC, 558 U.S. 310, 342 (2010) (internal quotation marks omitted) ("[P]olitical speech does not lose First Amendment protection simply because its source is a corporation.").

"The standing inquiry is claim-specific: a plaintiff must have standing to bring each and every claim that she asserts." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). Plaintiffs raise claims associated with four restrictions in Act 51. Plaintiffs argue that Act 51's provision for the government to certify certain groups to represent alternatives in the referendum campaign violates their rights pursuant to the First Amendment and other constitutional provisions. (Docket No. 1 at pp. 13-15, 18-19.) Plaintiffs also argue that a June 5 deadline which plaintiffs did not meet and which plaintiffs contend prevents them from campaigning both (i) violates their rights pursuant to the First Amendment and other constitutional provisions and (ii) subjects them to criminal penalties should they engage in referendum campaigning. Id. at pp. 16, 20. Plaintiffs additionally argue that a limit on campaign donations both (i) violates their rights pursuant to the First Amendment and other constitutional provisions and (ii) subjects them to criminal penalties should they exceed the limits. Id. at pp. 20-22. Finally, plaintiffs argue that a provision of Act 51 requiring challenges seeking a stay of the Referendum to be heard in the Puerto Rico Supreme Court violates their rights pursuant to the First Amendment and other constitutional provisions. Id. at pp. 22-23. The Court addresses each claim in turn.

1.  **Certification of Main Representative and Alliance Members**

Plaintiffs have sufficiently demonstrated standing for their claims associated with the main representative and alliance member provisions of Act 51.  According to plaintiffs, a main representative has been chosen for each of the two options in the referendum. (Docket No. 1 at p. 18.)  The plaintiffs' injuries from the existence of a main representative are sufficiently actual, imminent, and concrete because plaintiffs intend to campaign on the referendum and the government's imprimatur of certified representatives crowds out plaintiffs' voice or relegates it to a lower status. And the injuries from those provisions are particularized because the plaintiffs here each seek to be engaged in campaigning associated with the referendum. Finally, because the injuries are fairly traceable to the certification provisions in Act 51, and a favorable judicial decision could prevent the injury by enjoining Rosado and Vélez from enforcing the provisions, the plaintiffs have shown causation and redressability.

Defendants argue that plaintiffs' failure to apply to be main representatives defeats their standing.  In support, they cite Hernández-López v. Melecio, 38 F. Supp. 2d 70, 76 (D.P.R. 1998) (Cerezo, J.), in which this Court held that the plaintiffs

did not have standing to challenge a provision of a plebiscite law.  The provision stated, similar to Act 51, that political parties had the first opportunity to serve as main representative of an option in the plebiscite.  Id.  Plaintiffs in that case argued that the provision excluded them from participating in the plebiscite process.  Id.  The Court noted that plaintiffs provided no indication that a political party had sought to serve as main representative, and thus the provision did not injure plaintiffs. See id.

        The decision in Hernández-López is not applicable to the present circumstances.  In this case, plaintiffs are not arguing that they wish to serve as a main representative.  See Docket Nos. 1, 12-13.  Rather, plaintiffs are arguing that the mere existence of the main representative provision of Act 51

hinders their ability to campaign on the referendum.[6]  In other words, plaintiffs in this case are concerned with the fact that a main representative exists, whereas in Hernández-López the plaintiffs complained about how a main representative was chosen. Plaintiffs' failure here to seek certification as a main representative is no impediment to their standing on these claims.

**2.   The June 5 Deadline and Associated Criminal Penalties**

Plaintiffs' next claim concerns the June 5 deadline and associated criminal penalties in Act 51.   According to

---

[6] See, e.g., Docket No. 1 at pp. 13–14 ("[T]he power granted by the statute to the government of the Commonwealth of Puerto Rico to determine which political organization will represent any of the political alternatives set forth in the referendum violates the right to free speech . . . ."); id. at p. 15 ("No where [sic] in the statute, its statement of motives, or in the legislative record is there any reference as to any factual, legal, statutory, juridical, or constitutional basis or compelling state interest to justify the power granted to the CEE to choose a representative of any of the alternatives."); id. at pp. 16–17 ("The deadline of June 5, 2020, corresponds to five months before the referendum.  That means that if any group of people or political action committee that decides to campaign in favor or against any of the alternatives arises or is created at any time within those five months, it is barred from participating in the campaign, and if they attempt to do so or do so, they may confront a penalty of up to two years in prison and/or a $10,000.00 fine."); id. at p. 18 ("By entitling a particular party or group the right and/or power to represent an alternative, the statute as set forth herein, grants a favorable sanction to whoever is selected in that respect and in the eyes of the voters.  The exercise of such power by the government through the CEE further compels the rest of the groups, parties and political action committees to make alliances or coalitions, behind or in association with either the selected party or group to represent which ever [sic] alternatives."); id. ("The delegation of the power to the government to determine through whatever process which particular group of people can represent in society a particular idea constitutes an unconstitutional delegation of power insofar pursuant [sic] to the First, Fifth and Fourteenth Amendments of the Constitution of the United States, the government cannot make content based determinations regarding the right, liberty, and exercise of speech and regarding who is or is not entitled to represent in society a particular idea.  Moreover, it cannot do so as part of campaigns in anticipation of a referendum regarding those or any ideas.").

plaintiffs, the June 5 deadline for requesting certification prevents them from campaigning because they did not meet the deadline. Id. at pp. 16, 20. Should they campaign, plaintiffs allege, they risk criminal penalties. Id.

Plaintiffs have shown standing for this claim. The plaintiffs' injuries from the June 5 deadline and associated criminal penalties are sufficiently actual and imminent. This is because plaintiffs intend to engage in activities arguably proscribed by Act 51 (given their failure to request certification by June 5) and there is a credible threat of prosecution or enforcement should they do so. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158-63 (2014). There is no need for the plaintiffs to actually violate the provisions of Act 51. Id.; Steffel v. Thompson, 415 U.S. 452, 462 (1974); Mangual v. Rotger-Sabat, 317 F.3d 45, 56-57 (1st Cir. 2003). The obstruction in plaintiffs' ability to participate in referendum campaigning and to speak freely, among other things, are concrete injuries. And the injuries are particularized because the plaintiffs here each seek to be engaged in campaigning associated with the referendum. Finally, because the injuries are fairly traceable to the prohibitions and penalties of the June 5 deadline and the criminal sanctions and a favorable judicial decision could prevent the injury by enjoining Rosado and Vélez from preventing the

plaintiffs' campaigning, the plaintiffs have shown causation and redressability.

Defendants assert that plaintiffs do not have standing because Act 51 does not prevent plaintiffs from engaging in campaigns associated with the referendum. (Docket No. 27 at p. 2; Docket No. 33 at p. 3.) Defendants point out that VAMOS has already campaigned on the referendum and did not allege that any adverse action has been taken against it. See Docket No. 33 at p. 3 (citing id., Ex. 1). Defendants, however, offer no interpretation of article 6 and section 7.1(d) in support of their argument; in fact, they do not even cite the provisions. (Docket No. 27 at p. 2; Docket No. 33 at p. 3.)

To show standing, plaintiffs need only demonstrate that their constitutionally protected activities are "arguably proscribed" by the challenged law. Driehaus, 573 U.S. at 162–63. Act 51 states that "[n]o political party, party by petition, citizen group, or political action committee that has failed to meet the certification and reporting requirements provided in the subsection (j) above may assign, donate, and/or lend financial or in-kind resources" to certain entities." Act 51 § 6.1(k). While subsection (j) addresses reporting requirements, it says nothing about certification. See id. § 6.1(j). Consequently, the certification requirement discussed in subsection (k) may refer to

the certification requirements associated with the June 5
deadline.  Since plaintiffs cannot now meet the June 5 deadline,
they are arguably prevented from the activities regulated by
subsection (k).  The question of whether plaintiffs are actually
prevented is addressed below.

> **3.  Campaign Finance Limitations and Associated Criminal Penalties**

Plaintiffs have shown standing for their claim
associated with the donation and expenditure limitations.
Plaintiffs wish to collect and contribute donations.  (Docket
No. 13, Exs. 2-11.)  The campaign finance limitations in Act 51
injure plaintiffs in an actual, imminent, concrete, and
particularized manner because they restrict plaintiffs' ability to
collect and contribute donations.  And because the injuries are
fairly traceable to the prohibitions and penalties in article 6
and section 7.1(d) and a favorable judicial decision could prevent
the injury by enjoining Rosado and Vélez from enforcing the
campaign finance limitations, the plaintiffs have shown causation
and redressability.  Defendants raise no objection to plaintiffs'
standing to assert the campaign finance-related claim.

> **4.  The Requirement to Seek a Stay of the Referendum in the Puerto Rico Supreme Court**

Plaintiffs have also shown standing for the claims
that concern section 8.3(a).  A broad reading of the complaint

suggests that the plaintiffs want the Court to stay the November referendum because of the alleged unconstitutionality of article 6 and section 7.1(d). See id. at p. 25. As section 8.3(a) purports to prevent them from obtaining that stay in this Court and a favorable ruling from this Court would remedy the injury by enjoining Rosado and Vélez from enforcing section 8.3(a), plaintiffs have standing for their section 8.3(a)-related challenge. Defendants raise no objection to plaintiffs' standing to assert this claim.

### E.   Synthesis

The upshot of this section is that only two claims are justiciable. Those are the claims pursuant to section 1983 concerning violations of the Federal Constitution against Rosado and Vélez in their official capacities.

Also, plaintiffs' only claims are equitable in nature and pursuant to section 1983, they have no right to a jury trial. Wilson v. Bailey, 934 F.2d 301, 305 n.4 (11th Cir. 1991). Their demand for a jury trial, (Docket No. 1 at p. 25,) is **DENIED.**

### III. Permanent Injunction Standard

The plaintiffs move for a permanent injunction to preclude Rosado and Vélez from enforcing article 6 and sections 7.1(d) and

8.3(a) of Act 51.  (Docket No. 13 at p. 11.)[7]  Injunctive relief

is "an act of equitable discretion by the district court."  eBay

Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).  This is

"an extraordinary remedy never awarded as of right."  Sindi v. El-

Moslimany, 896 F.3d 1, 29 (1st Cir. 2018) (internal quotation marks

omitted). The plaintiffs shoulder the burden of establishing that:

> (1) [they have] suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the
> plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not be
> disserved by a permanent injunction.

The Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc., 605

F.3d 10, 19 (1st Cir. 2010) (internal quotation marks omitted).

In the permanent injunction context, "the movant must show actual

success on the merits."  Largess v. Supreme Judicial Court, 373

F.3d 219, 223 n.2 (1st Cir. 2004); see 1 Moore's Federal Practice

---

[7] Courts can consolidate preliminary and permanent injunction applications.
Vaquería Tres Monjitas, Inc. v. LaBoy, 448 F. Supp. 2d 340, 346-47 (D.P.R. 2006)
(Domínguez, J.).  For consolidation to be proper, the parties must have (i)
"clear and unambiguous notice" of the consolidation and (ii) an opportunity to
be heard.  Id.  The parties have received clear and unambiguous notice of the
consolidation and an opportunity to be heard.  On September 9, the Court ordered
the defendants "to respond to the motion for a temporary restraining order and
motion for a preliminary and permanent injunction no later than September 18,
2020.  Any reply will be filed no later than September 21, 2020."  (Docket
No. 15.)  Then, on September 15, the Court ordered the defendants "to answer
the complaint, file any appropriate motion, or file any response to the
plaintiffs' motions, including the motion for preliminary and permanent
injunctions, no later than September 18, 2020 at 4:00 PM" and "[t]he plaintiffs
shall reply to or otherwise oppose any of the defendants motions or filings no
later than September 21, 2020 at 4:00 PM."  (Docket No. 24.)

and Procedure § 10A.23 (2020) ("[A] permanent injunction has the added requirement of success on the merits.").

A permanent injunction may be entered without an evidentiary hearing where there are no triable issues of fact.  United States v. McGee, 714 F.2d 607, 613 (6th Cir. 1983); Socialist Workers Party v. Ill. State Bd. of Elections, 566 F.2d 586, 587 (7th Cir. 1977) (per curiam).  The motion for preliminary and permanent injunctions presents a facial attack on provisions of Act 51 and thus a "pure question of law."  New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19 (1st Cir. 2002).  In any event, the parties do not identify any triable issues of fact. The Court therefore does not order an evidentiary hearing.

### A.  Facial Challenge

The plaintiffs set forth a facial challenge, contending that article 6 and sections 7.1(d) and 8.3(a) are unconstitutional and void ab initio.  (Docket No. 20 at p. 18.)  "A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."  Bucklew v. Precythe, 139 S. Ct. 1112, 1127 (2019).  Plaintiffs must show "that no set of circumstances exists under which the . . . [challenged provisions of Act 51] would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987); see, e.g., Hightower v. City of Boston, 693 F.3d 61, 78 (1st Cir. 2012) ("Because Hightower has not shown

that the statute lacks any plainly legitimate sweep, her facial
attack fails."). This burden is a "supremely high hurdle." United
States v. Sampson, 275 F. Supp. 2d 49, 67 (D. Mass. 2003).

      The gravamen of the plaintiffs' motion for injunctive
relief is that Act 51 impermissibly restricts political
participation in the referendum campaign. See Docket No. 13.
Rosado and Vélez repeatedly assure the Court that plaintiffs can
participate in educational campaigns supporting one of the
alternatives. (Docket No. 28 at pp. 2, 6, 10, 23; Docket No. 35
at pp. 4, 8-11, 19-20, 23-24, 35.) This *ipse dixit* assertion
misconstrues the statutory language, evincing a simplistic
understanding of Act 51.

      To assess whether article 6 and sections 7.1(d) and
8.3(a) comport with the First Amendment, the Court first evaluates
the statutory language. United States v. Councilman, 418 F.3d 67,
72 (1st Cir. 2005) ("We begin, as we must, with the statute's
text."). Remarkably, neither Rosado nor Vélez cite Act 51 in their
opposition to the plaintiffs' motion. (Docket Nos. 28, 35.)
Instead, they rely on regulations promulgated by government
agencies to argue that Act 51 is constitutional. (Docket No. 28,
Ex. 1; Docket No. 35, Ex. 3.) These regulations are "highly
relevant" to the constitutional analysis. Ward v. Rock Against
Racism, 491 U.S. 781, 795 (1989). The regulations cannot, however,

save a state law that flouts the Constitution.  See United States
v. Stevens, 559 U.S. 460, 481 (2010) (alteration in original)
(citations and internal quotation marks omitted) (holding that
courts "will not rewrite a . . . law to conform it to
constitutional requirements, for doing so would constitute a
serious invasion of the legislative domain, and sharply diminish
Congress's incentive to draft a narrowly tailored law in the first
place"); cf. Sindicato Puertorriqueño de Trabajadores v. Fortuño,
699 F.3d 1, 10 n.6 (1st Cir. 2012) (citation omitted) (explaining,
in the context of administrative exhaustion, that "because the
provisions of Law 222 that plaintiffs challenge are so
constitutionally suspect, any administrative relief that the
Election Comptroller could have provided would have been
inadequate").

## IV.  Section 8.3(a)

Section 8.3(a) purports to channel certain challenges to the
Puerto Rico Supreme Court.  According to the provision, "Any
challenge, dispute, or legal action that directly raises, or
entails among its consequences, the stay of proceedings involving
the holding of the plebiscite during the hours and on date provided
in this Act, shall be considered and resolved directly by the
Supreme Court of Puerto Rico."  Id. § 8.3(a).  Plaintiffs seek a
declaration that the provision is void as unconstitutional because

it "pretend[s] to limit the jurisdiction of the courts of law of the United States over controversies arising regarding the statute" and because it violates the First, Fifth, and Fourteenth Amendments as an infringement of both due process and the right to petition the government for the redress of grievances. (Docket No. 1 at pp. 22-23.)

Section 8.3(a) cannot deprive this Court of subject matter jurisdiction. "'The jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress.' Once Congress has conferred subject matter jurisdiction on the federal courts, state law cannot expand or contract that grant of authority." MRCo Inc. v. Juarbe-Jiménez, 521 F.3d 88, 95-96 (1st Cir. 2008) (quoting Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167 (1939)).

The First Amendment to the Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Although the explicit text applies to Congress, the protection also applies to the States and territories. United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 221 n.4 (1967); Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).

The right to petition includes the right of access to the

courts.  Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S.
508, 510 (1972).  "For decades, the Supreme Court has consistently
recognized the right to petition all branches of the government,
including the courts, for redress of grievances as among the most
precious of the liberties safeguarded by the Bill of Rights."
Powell v. Alexander, 391 F.3d 1, 16 (1st Cir. 2004) (citation and
internal quotation marks omitted).  The constitutional guarantee
applies to both state and federal courts.  ACA Int'l v. Healey,
Civ. No. 20-10767, 2020 WL 2198366, at *9 (D. Mass. May 6, 2020).

     The Court has not identified the precise standard applicable
to claims asserting an abridgement of the right to petition.  The
right to petition has "a sanctity and a sanction not permitting
dubious intrusions."  Thomas v. Collins, 323 U.S. 516, 530 (1945).
A panel of the Seventh Circuit Court of Appeals stated that an
individual has a right "to obtain access to the courts without
undue interference" so long as the claim has "a reasonable basis
in law or fact."  Snyder v. Nolen, 380 F.3d 279, 291 (7th Cir.
2004) (per curiam).

     Section 8.3(a) unconstitutionally abridges the right to
petition through access to the courts, whichever of the above
standards is applied, because it purports to deny access to the
federal courts.  Accordingly, Rosado and Vélez are **PERMANENTLY
ENJOINED** from enforcing the associated provision in section

8.3(a).

## V.   Article 6

The plaintiffs argue that article 6 is void for vagueness. (Docket No. 13 at p. 10). They also assert that government endorsement of the established political parties is unconstitutional. (Docket No. 13.)  The Court agrees.

### A.   Referendum Campaign Regulations

Article 6 is entitled "Representation of the Options on the Ballot." Act 51 art. 6.  This article sets forth guidelines for the referendum campaign. Id. These guidelines establish "main representatives" for the "yes" and "no" alternatives, and contemplate the formation of an "alliance or coalition." See id. § 6.1(e).[8]    Article 6 does not, however, define "main representative," "alliance," or "coalition," nor does it clarify what, precisely, the main representatives and alliance members are

_____

[8] The Election Code provides that in referendums, "any political party, or citizen group duly certified by the [CEE] may advocate for or against any of the options to be voted on in the same and, in the course thereof, may perform any lawful political activity subject to the limitations provided in this section and in the [Campaign Financing Act]." Laws P.R. Ann. tit 16, § 4216. Political parties and citizen groups are generally permitted to participate "provided that their central governing bodies notify the [CEE] of their intention within thirty (30) days following the effective date of the special law authorizing the [referendum]." Id. § 4217.  The Court need not address the validity of these provisions.  The only question presented by the permanent injunction motion is whether article 6 and sections 7.1(d) and 8.3(a) are constitutional.

expected to do regarding the referendum campaign.[9]   Article 6 states that the CEE "shall certify" the main representatives, but does not specify the characteristics that differentiate the main representative from other referendum participants.  Id. § 6.1(a).[10] There are three "options" for the main representative position, enumerated in order of priority.

### 1.    The Main Representative Options

"As a first priority," the CEE "shall certify only one political party or party by petition [to] participate in the 2020 General Election as a main representative for each of the

---

[9] Generally, an alliance is "an association to further the common interests of the members."   Merriam Webster Online Dictionary, www.merriam-webster.com/dictionary/alliance (last visited Sept. 24, 2020).  A coalition is "a temporary alliance of distinct parties, persons or states for joint action. Id. https://www.merriam-webster.com/dictionary/coalition#synonyms.   Because there is no discernable difference between an alliance and coalition, the Court employs the terms throughout this Opinion and Order interchangeably.

[10] The term "certification" in Act No. 51 ("Act") refers to three distinct procedures: (1) the United States Attorney General may issue a "certification" to obligate funds for the referendum, (2) the "results of the Plebiscite are certified by the ["CEE]," and (3) the CEE shall certify a "main representative" for each option. Act 51 art. 6.   Article 6 contains language that implies an alliance is also subject to certification.  See id. § 6.1(h) (stating that the CEE shall govern "all that pertains to the certification as main representative, including alliances or coalitions.").

options printed on the plebiscite's ballot." Id. § 6.1(a).[11]  The

main representative application was due June 5, 2020, twenty days

after the Puerto Rico legislature enacted the statute.  Id.  There

are no extensions.  Id.

       "As a second priority," citizen groups or political

action committees "duly registered by natural persons, and whose

operating, advertising staff, material, or equipment expenditures

are neither operationally nor financially related to juridical

persons may request designation as the main representative."  Id.

§ 6.1(b).

       After June 5, 2020, "no alliance or coalition may

request or be recognized or certified as main representative,

alliance, coalition for any of the options printed on the

plebiscites' ballot."  Id. § 6.1(c).  Option three contains the

first reference to an "alliance" and "coalition," terms that are

synonymous and convey an association of distinct entities.  If no

certification "for representation, alliance, or coalition of any

---

[11] Puerto Rico has a "traditional three party [system]," including the New Progressive Party ("NPP"), the Popular Democratic Party ("PDP"), and the Puerto Rican Independence Party ("PIP").  Puerto Ricans for P.R. Party v. Dalmau, 517 F. Supp. 2d 604, 606 (D.P.R. 2007) (Gelpí, J.); Civil Action Party v. Commonwealth, 2000 T.S.P.R. 29, 150 D.P.R. 359, 2000 P.R. Sup. LEXIS 18, at *7 (2000) (noting that the main political parties "have controlled Puerto Rico's electoral and ideological scene for over half a century").  A party by petition is a "[p]olitical party that was registered as such in the Commission . . . in order to participate in the general election for a specific municipality, representative district or senate district, with the intention of running at least one candidate for Governor."  Laws P.R. Ann. tit. 16, § 4003(72).

kind has been issued . . . it shall be recognized as vacant for all purposes." Id.

### 2. Alliance Requirements

The requirements for alliance members are complex. Article 6 implies that there is a distinction between certified and non-certified organizations. Section 6.1(e) provides:

> Any party, citizen group, or political action committee not certified as the main representative of one of the options printed on the plebiscite's ballot, may form an alliance or coalition with the party certified as the main representative. Such fact shall be notified in writing to the Commission and to the Office of Election Comptroller.

Id. § 6.1(e) (emphasis added). Essentially, section 6.1(e) permits "any" organization to form an alliance in accordance with the notice requirement. Section 6.1(i) reverses course, however, by demanding putative alliance members to "meet the requirements" set forth in section 6.1. This section provides:

> Any political party or party by petition, citizen group, and political action committee that has failed to notify and meet the requirements to be designated as main representative, alliance or coalition within the terms provided in this Section, shall not be entitled to be considered as main representative, or as part of an alliance, or coalition.

Id. § 6.1(i) (emphasis added). Accordingly, section 6.1(i) imposes an additional requirement that alliance members satisfy the conditions in section 6.1. These conditions are more rigorous than merely providing notice to the relevant government agencies.

3.    **Section 6.1(j): Declaration of Organization, Financial Reports, and the Puerto Rico Political Campaign Financing Oversight Act Seminar**

Section 6.1(j) is expansive, applying to the entire electorate.  This provision imposes three requirements on any "political party, party by petition, citizen group, political action committee, and natural or juridical person, <u>whether or not certified</u> as the main representative or alliance member of any of the options printed on the ballot." Id. § 6.1(j) (emphasis added).

First, the chairperson and treasurer are required to attend a seminar regarding the Puerto Rico Political Campaign Financing Oversight Act (hereinafter, "Campaign Financing Act"), Laws P.R. Ann. tit. 16, §§ 621-634.  Act 51 § 6.1(j).  Second, applicants must submit a Declaration of Organization to the Office of Election Comptroller.  Id.; see Laws P.R. Ann. tit. 16, § 626. Third, applicants shall "file the reports required by [the Campaign Financing Act]." Act 51 § 6.1(j).  These obligations are mandatory for organizations that receive or use "contributions that, in the aggregate, exceed five hundred ($500) and/or incur[] campaign expenditures of any kind in support or against any of the options on the plebiscite's ballot, including to promote abstention, any type of voting expression modality, or any other status option." Id.  From printing handbills to renting an office, even the most rudimentary grassroots campaign will incur some expense.

Consequently, the requirements set forth in section 6.1 extend to virtually every organization that campaigns on the referendum.

Like the main representative, alliance members must complete the section 6.1(j) requirements "prior to [their] certification in the Commission." Id. This provision applies to any organization "whether or not certified," yet mandates that the chairperson and treasurer attend the seminar "prior to" certification. Id. Accordingly, either the statute omits the seminar deadline for non-certified organizations, or it requires that all organizations obtain certification.

### 4. Section 6.2(a): Registration Requirement

Pursuant to section 6.2(a), citizen groups "shall provide proof of registration as required by [the Campaign Financing Act] regardless of whether these shall participate individually, as a main representative, an alliance, or as a coalition." Id. § 6.2(a) (emphasis added). Registration is due before the "Commission's certification," which must occur no later than June 15, 2020. Id.; see id. § 6.1(d). Reference to individual participation suggests that the regulatory regime set forth in article 6 extends to all forms of political expression.

### 5.   Section 6.2(b): Board Member and Political Disposition Disclosures

Section 6.2(b) mandates that a political party or citizen group shall "notify the [CEE] whether it intends to represent said option individually or as an organization, or it shall identify the alliance or coalition under which it shall be participating" in the request for certification.   Id. § 6.2(b). This provision anticipates that organizations will form alliances with the main representative by June 5, 2020, 150 days before the referendum.

### 6.   Financial Prohibitions and Criminal Liability

Failure to satisfy the Declaration of Organization, reporting and requirements is consequential, resulting in an absolute ban on campaign spending.   Section 6.1(k) provides:

> No political party, party by petition, citizen group, or political action committee that has failed to meet the certification and reporting requirements provided in the subsection (j) above may assign, donate, and/or lend financial or in-kind resources, to any political party, party by petition, citizen group or political action committee certified as main representative or that is part of an alliance.

Id. § 6.1(k). Because section 6.1(j) applies to all organizations "whether certified or not," the prohibition on monetary contributions is profound.   An organization's coffers are completely sealed regarding political contributions unless it

satisfies the prerequisites in section 6.1(j).  Violations of article 6 may also result in a felony conviction and monetary fines.  Id. §§ 6.1(l), 6.2(d).

**B.   Due Process**

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The vagueness doctrine derives from the due process clause, "protecting against the ills of laws whose 'prohibitions are not clearly defined.'"  Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 62 (1st Cir. 2011) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)).

The First Amendment protects individuals from statutes that are "susceptible of sweeping and improper application."  Dombrowski v. Pfister, 380 U.S. 479, 482 (1965).  This protection is referred to as the doctrine of overbreadth.  Courts approach "vagueness and overbreadth as logically related and similar doctrines."  Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 479 n.13 (7th Cir. 2012) (internal quotation marks omitted).

A statute is void for vagueness in two circumstances.  The first is if "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  The second is if "it authorizes or even encourages arbitrary and

discriminatory enforcement." <u>Id.</u>  Due process does not demand
that the legislature account for every conceivable application of
a law.  Any statute is "susceptible to clever hypotheticals testing
its reach."  <u>Platt v. Bd. of Comm'rs on Grievances & Discipline of
Ohio Sup. Ct.</u>, 894 F.3d 235, 251 (6th Cir. 2018); <u>IMS Health Inc.
v Ayotte</u>, 550 F.3d 42, 61 (1st Cir. 2008) ("[S]tatutes do not need
to be precise to the point of pedantry, and the fact that a statute
requires  some  interpretation  does  not  perforce  render  it
unconstitutionally vague.").

        The Constitution demands, however, a "'greater degree of
specificity' in cases involving the First Amendment."  <u>McKee</u>, 649
F.3d at 62 (quoting <u>Buckley v. Valeo</u>, 424 U.S. 1, 77 (1976)); <u>see
Wis. Right to Life, Inc. v. Barland</u>, 751 F.3d 804, 835 (7th Cir.
2014)  ("Vague  or  overbroad  speech  regulations  carry  an
unreasonable risk that speakers will self-censor, so the First
Amendment  requires  more  vigorous  juridical  scrutiny.").   The
governing standard is whether Act 51 prohibits "an act in terms so
uncertain that persons of average intelligence would have no choice
but to guess at its meaning and modes of application."  <u>McKee</u>, 649
F.3d at 62.

        The plaintiffs intend to participate in the referendum
campaign, but are wary of potential criminal liability.  (Docket
No. 13.)  Pursuant to sections 6.1(l) and 6.2(d),

>       Any natural or juridical person who fraudulently
>       violates any of the provisions of this Section or who
>       being required hereunder, voluntarily fails or refuses
>       to comply therewith, shall be guilty of an election
>       offense and, upon conviction, shall be punished by
>       imprisonment for a term not to exceed two (2) years or
>       by a fine not to exceed ten thousand dollars ($10,000)
>       for every violation, or both penalties, at the
>       discretion of the Court.

Act 51 §§ 6.1(l), 6.2(d).[12]

        Article 6 sets forth the requirements to be the main

representative.  The Court cannot ascertain how failure to achieve

main representative status is criminal.  For example, Article II

of the United States Constitution provides that "No person except

a natural born citizen . . . shall be eligible to the office of

President."  U.S. Const. art. II, § 1.  Those who are not natural

born citizens are precluded from presidential office.  They are

not, however, punished for failing to meet this requirement.  Those

that violate article 6 are precluded from serving as the main

representative or alliance member.  In addition, they are subject

to imprisonment and substantial monetary fines for "fraudulently

[violating] any of the provisions of this Section," or "voluntarily

[failing or refusing] to comply therewith."  Act 51 §§ 6.1(l),

6.2(d).  This broad spectrum of potential criminal liability fails

to place the public on notice regarding prohibited activities.

---

[12] Sections 6.1(l) and 6.2(d) are identical.

See NAACP v. Button, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").  By punishing the failure to obtain main representative and alliance status, Act 51 suffers from an overbreadth of criminal liability.  The vague parameters of the main representative and alliance designations fail to place the public on notice regarding proscribed acts.  See Citizens United v. FEC, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.").  The people of Puerto Rico have the right to discuss and debate the propriety of Statehood without fear of imprisonment.  See Meyer v. Grant, 486 U.S. 414, 421 (1988) ("Unquestionably, whether the trucking industry should be deregulated in Colorado is a matter of societal concern that appellees have the right to discuss publicly without risking criminal sanctions.").

Coordination with the main representative may result in criminal prosecution.  For example, members of a citizen group who form an "alliance," but fail to notify the CEE, are subject to a two-year term of imprisonment and/or a $10,000 fine.  Act 51 § 6.1(l).  There is no guidance regarding the establishment of an alliance.  This ambiguity is amenable to arbitrary enforcement.

See United States v. Davis, 139 S. Ct. 2319, 2326 (2019) ("Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide.").

Rosado claims that "VAMOS has already announced that it will campaign for the 'No' option and has suffered no adverse action." (Docket No. 35 at p. 10.)   To substantiate this statement, Rosado cites a news article reporting that a "group of organizations and citizens painted a giant NO on top of the Capitol building in repudiation of the 'Statehood Yes or No' plebiscite." (Docket No. 35, Ex. 1 at p. 1.)  The news article also refers to a social media campaign, and "activities that seek to disobey Act 51." Id. at p. 3.  Rosado's reasoning infers that because VAMOS illuminated the Capitol building with the word "No," that the organization is immune for prosecution.  This argument is flawed. That an isolated event occurred without incident does not guarantee that law enforcement authorities will tolerate activities that are more provocative.  See Griswold v. Conn., 381 U.S. 479, 483 (1965) (holding that freedom of association "is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it"); Mangual, 317 F.3d at 57 ("As to whether a First Amendment

plaintiff faces a credible threat of prosecution, the evidentiary
bar that must be met is extremely low.").

> C.   **The First Amendment**

The plaintiffs contend that article 6 "violates the
right to free speech set forth in the First Amendment."  (Docket
No. 13 at p. 20.)  The Court agrees.

The First Amendment of the United States Constitution
provides that "Congress shall make no law respecting the
establishment of religion, or prohibiting the free exercise
thereof; or abridging the freedom of speech, or of the press; or
of the right of people to peaceably assemble." U.S Const. amend I.
This Amendment is applicable to Puerto Rico.  See, e.g., Posadas
de. P.R. Assocs. v. Tourism Co., 478 U.S. 328, 331 n.1 (1986)
("Puerto Rico is subject to the First Amendment Speech Clause.").
The Constitution presumes that "speakers, not the government, know
best both what they want to say and how to say it."  Riley v. Nat'l
Fed'n of Blind, 487 U.S. 781, 791 (1988) (quotation omitted).

In 1958, the Supreme Court announced that "the freedom
to engage in association for the advancement of beliefs and ideas
is an inseparable aspect of the 'liberty' assured by the Due
Process Clause of the Fourteenth Amendment, which embraces freedom
of speech." NAACP v. Ala. ex. rel. Patterson, 357 U.S. 449, 460
(1958); see Padilla-García v. Rodríguez, 212 F.3d 69, 74 (1st Cir.

2000).  Freedom of association is rooted in the First Amendment, "[emerging] out of a political context dominated by the growing paranoia over the threat of domestic communists in the late 1940s and early 1950s."  John D. Inazu, <u>The Strange Origins of the Constitutional Right of Association</u>, 77 Tenn. L. Rev. 485, 488-89 (2010).[13]  Not every limitation on this freedom, however, is unconstitutional.  <u>See, e.g.</u>, <u>Allendale Leasing v. Stone</u>, 614 F. Supp. 1440, 1455 (D.R.I. 1985) ("The Supreme Court's recognition of freedom of association does not extend to a right of potential Bingo players to play Bingo.").

        States possess the authority to regulate and administer elections for public office and policy referenda.  <u>Pérez-Guzman v. García</u>, 346 F.3d 229, 238 (1st Cir. 2003) ("Fair, honest, and orderly elections do not just happen.  Substantial state regulation is a prophylactic that keeps the election process from disintegrating into chaos.") (citing <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1974)).  The authority to regulate elections, however, is finite.  Puerto Rico is bound by the "limits established by the

---

[13] Other scholars argue that the Framers recognized the freedom to associate despite the absence of this term in the First Amendment.  Nicholas C. Ulen, <u>Corporations, Natural Rights, and the Assembly Clause: An Originalist Critique of Corporate Speech Jurisprudence</u>, 10 Wake Forest J.L. & Pol'y 25 (2019).  In <u>Citizens United v. FEC</u>, the Supreme Court acknowledged that the Bill of Rights protects individual liberty, but that "a person's right to speak includes the right to speak <u>in association with other individual persons</u>."  558 U.S. 310, 391 (2010) (Scalia, J., concurring in part).

First  Amendment . . .  including  the  freedom  of  political
association." Wash. State Grange v. Wash. State Republican Party,
552 U.S. 442, 451 (2008) (internal quotation and citation omitted).

### 1.    **The Sliding Scale of Judicial Review**

The standard of judicial review in the context of
the First Amendment is a "flexible framework." Werme v. Merill,
84 F.3d 479, 483 (1st Cir. 1996).  A two-tiered inquiry governs
the Court's analysis.  First, courts assess the "character and
magnitude of the burden the State's rule imposes on those rights
against the interests the state contends justify that burden."
Lyman v. Baker, 954 F.3d 351, 376 (1st Cir. 2020) (quoting Timmons
v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)).  Second,
the "extent to which the State's concerns make the burden
necessary" is considered.  Id.

The  severity  of  the  restriction  calibrates  the
scope of judicial review.  See Werme, 84 F.3d at 483 ("[T]he
rigorousness of the inquiry into the propriety of a state election
law depends upon the extent to which a challenged regulation
burdens First and Fourteenth Amendment rights.") (quoting Burdick
v. Takushi, 504 U.S. 428, 434 (1992)).  Courts endeavor to strike
a "constitutional equilibrium." Libertarian Party of Me. v.
Diamond, 992 F.2d 365, 370 (1st Cir. 1993); Libertarian Party of
N.H. v. Gardner, 638 F.3d 6, 14 (1st Cir. 2011) ("We review all of

the First and Fourteenth Amendment claims under [a] sliding scale approach.").

Strict scrutiny and exacting scrutiny are the predominant standards of review in actions setting forth constitutional challenges to election regulations. Strict scrutiny is the "highest level of review," nullifying restrictions on speech unless "the government proves that they are narrowly tailored to serve compelling state interests." Susan B. Anthony List v. Driehaus, 814 F.3d 466, 473 (7th Cir. 2016). The exacting scrutiny standard of review is less onerous, but also formidable. See Wash. Post. v. McManus, 944 F.3d 506, 520 (4th Cir. 2019) (noting that "strict scrutiny, in practice, is virtually impossible to satisfy, while exacting scrutiny is merely difficult"). In fact, the Supreme Court has invalidated four election laws pursuant to this intermediate standard of review.[14] Exacting scrutiny is satisfied by demonstrating that the regulation is "closely drawn to match a sufficiently important

---

[14] See Davis v. FEC, 554 U.S. 724, 744-55 (2008) (holding that the FEC failed to satisfy the "exacting security" standard review regarding campaign disclosure requirements); Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 204 (1999) (holding that a Colorado law forcing "paid [petition] circulators to surrender the anonymity enjoyed by their volunteer counterparts "fail[ed] exacting scrutiny"); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347-57 (1995) (holding that "Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech" pursuant to an exacting scrutiny standard of review); Buckley, 424 U.S. at 39-51 (invalidating an independent expenditure limitation after holding that the FEC must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression").

interest." Dagget v. Comm'n on Gov't Ethics & Election Practices,
205 F.3d 445, 454 (1st Cir. 2000) (quoting Buckley, 424 U.S. at
25).   This  standard  ensures  that  the  "regulation  is  narrowly
tailored to an overriding state interest." Serafine v. Branaman,
810 F.3d 354, 365 (5th Cir. 2016) (quoting McIntyre, 514 U.S. at
347).

          The plaintiffs assert that strict scrutiny is the
appropriate standard of review.   (Docket No. 13 at pp. 18—19.)
They argue that Act 51 contains "content-based restrictions on
speech about matters of public concern." Id. at p. 18.   Content-
based restrictions are presumptively invalid.   Caribbean Int'l
News Corp. v. Agostini, 12 F. Supp. 2d 206, 217 (D.P.R. 1998)
(Laffitte, J.).   The motion for injunctive relief sets forth no
explanation regarding the specific content purportedly subject to
government regulation.

          Rosado and Vélez argue that the exacting scrutiny
standard of review is proper.   (Docket No. 28 at p. 13; Docket
No. 35 at p. 25.)   The Court need not resolve whether the severity
of Act 51 warrants strict scrutiny, because the challenged
provisions fail to pass constitutional muster pursuant to the
exacting scrutiny standard of review.   See McManus, 944 F.3d at
520 ("[The court] declines to decide whether strict or exacting
scrutiny should apply to a disclosure law like the one here because

we hold that the Act fails even the more forgiving standard of exacting scrutiny."); <u>Minn. Citizens Concerned for Life, Inc. v. Swanson</u>, 692 F.3d 864, 875 (8th Cir. 2012) ("But even if exacting scrutiny is appropriate . . . Minnesota's [election] law fails").

### 2.   Limitations on Political Participation

The Court is unaware of any jurisdiction beyond Puerto Rico, and the parties cite no authority, in which a state government mandates the appointment of an official representative for a referendum alternative.  By assigning the political parties a right of first refusal for the main representative position, article 6 incorporates a partisan disposition characteristic of campaigns for public office.  <u>See</u> <u>Justice v. Hosemann</u>, 71 F.3d 285, 298 (5th Cir. 2014) ("Candidate elections are typically partisan contests, in which the candidate's party affiliation provides voters who cannot research every candidate with a general sense of whether they are likely to agree with a candidate's views. Ballot initiatives lack such a straightforward proxy."); <u>Tex. Democratic Party v. Benkiser</u>, 459 F.3d 582, 588 (5th Cir. 2006) ("[T]he goal of a political party is to gain control of government by getting its candidates elected") (citation and quotation omitted).  Accordingly, Act 51 presents the Court with an anomaly. In evaluating this novel election law, the Court "[errs] on the

side of protecting political speech rather than suppressing it."
FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 457 (2007).

### a.    The June 5, 2020 Deadline

According to plaintiffs, "if any group . . .
decides to campaign in favor or against the alternatives [or] is
created [after June 5, 2020, it is] barred from participating in
the campaign." (Docket No. 13 at pp. 24—25.)  The Court agrees.

Pursuant to section 6.1(c), "no alliance or
coalition may request or be recognized or certified as main
representative, alliance or coalition" after June 5, 2020.  Act 51
§ 6.1(c).  The plaintiffs had to attend the Office of Comptroller
seminar, file a Declaration of Organization, submit financial
reports pursuant to the Campaign Financing Act, and provide proof
of registration in just twenty days – a bureaucratic gauntlet for
the most dedicated applicant to complete in less than a month.
Id. §§ 6.1(c), 6.1(i), 6.1(j), 6.2(a).

The defendants claim that Act 51 "does not
foreclose Plaintiffs' rights to participate in the campaigns in
favor of one of the alternatives."  (Docket No. 28 at p. 3.)
Indeed, section 6.2(a) insinuates that organizations will
"participate individually.  Act 51 § 6.2(a).  Because Act 51 does
not define "alliance" or "coalition," the boundary between
individual participation and alliance formation is vague.  See

<u>Buckley</u>, 424 U.S. at 41 (Statutory language may be "so indefinite that [it] fails to clearly mark the boundary between permissible and impermissible speech").  Is a public statement of support for the main representative an alliance? What level of coordination and mutual agreement is necessary to form an alliance?

Presumably, the CEE must certify a main representative before the formation of an alliance.  Organizations cannot request an alliance without knowing which political party the CEE certified.  In fact, the plaintiffs' "decision [to seek certification] was made in the month of June once it was too late to get certified before the State Elections Commission of Puerto Rico and the Office of the Comptroller of Elections."  (Docket No. 13, Ex. 2 at p. 1.)   That the plaintiffs may conceivably participate in the referendum campaign as individuals is no reason to excuse undue restrictions on the freedom to associate.  <u>See</u> <u>Cal. Democratic Party v. Jones</u>, 530 U.S. 567, 581 (2000) ("We have consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired.") (citation omitted); <u>McCutcheon v. FEC</u>, 572 U.S. 185, 206 (2014) (holding that the "degree to which speech is protected cannot turn on a legislative or judicial determination that particular speech is useful to the democratic process").

The certification timeframe coincides with Executive Order 2020-041, signed on May 21, 2020 by Governor Wanda Vázquez-Garced in response to the COVID-19 pandemic.[15]  This order expired on June 15, 2020, instructing that all citizens "remain at their place of residence or shelter 24 hours a day, 7 days a week during the lockdown period" with limited exceptions.  Id. Government agencies continued "to carry out their functions and provide any services that may be offered without compromising the health and safety through telework."  Id.  The restrictions imposed by Executive Order 2020-041 amplify the severity of the June 5, 2020 deadline.

The deadline in article 6 is more restrictive than the default schedule set forth in the Campaign Financing Act. Laws P.R. Ann. tit. 16, § 626.  Political action committees and other "authorized committees" must file the Declaration of Organization "with the Election Comptroller within ten (10) business days following its designation as such."  Id.  The designation date determines the registration deadline, followed by "quarterly reports under oath that contain a list of such contributions or gifts and expenditures."  Laws P.R. Ann. tit. 16, § 627.  The Campaign Financing Act is consistent with the Maine,

---

[15]    Executive    Order    2020-041,    May    21,    2020    (available    at https://www.estado.pr.gov/en/executive-orders/)    (certified    English translation) (last visited Sept. 24, 2020).

New Hampshire, Massachusetts, and Rhode Island election codes,[16]
permitting ballot question committees to campaign without adhering
to "non-extendable" deadlines like the deadline in section 6.1(d)
of Act 51.  The lack of precedent for a fixed registration deadline
supports the plaintiffs' argument that the 20-day window is overly
restrictive.

The expenditure prohibition in section 6.1(k)
compounds the gravity of the June 5, 2020 deadline by forfeiting
campaign contributions.  According to Act 51, certification and
registration is necessary for citizen groups and political action
committees to "assign, donate, and or/lend financial or in-kind
resources, to [any party] certified as main representative or that
is party of an alliance."  Act 51 § 6.1(k).

The main representative and alliance deadlines
are equivalent to the notice period in <u>Sullivan v. City of Augusta</u>,

---

[16] <u>See</u> 21 M.R.S.A. § 1056-B (Maine law providing that ballot question committee
"[receiving] contributions or [making] expenditures that exceed $5,000 shall
register with the commission . . . within 7 days of receiving those contributions
or making those expenditures"); RSA 664:3-a (New Hampshire law stating that
political advocacy organizations "may register for an election cycle at any
time after the final report due following the then-most-recent general
election"); Campaign Finance Guide, State Ballot Question Committees, pg. 3 (In
Massachusetts, a state ballot committee "must organize with the [Office of
Political Campaign and Finance] prior to raising any money, and file reports
electronically")     (July,     2019)     (available     at
http://files.ocpf.us/pdf/guides/guidestatebq.pdf)   (last   visited   Sept.   24,
2020); R.I. Gen. Laws § 17-25.2—5 (Rhode Island law stating that a position
statement is due when the "first report must filed by ballot-question advocate
expends a cumulative total that exceeds one thousand dollars ($10,000) for
ballot question advocacy and ending the last day of the first full month
following such date, to be filed with the board of elections due no later than
seven (7) days after the end of the month).

511 F.3d 16, 27 (1st Cir. 2007).  The City of Augusta, Maine, required a thirty-day advance application for "an intended parade, march or other use of public ways within the City." Id.  The First Circuit Court of Appeals observed, however, that "[n]otice periods restrict spontaneous free expression and assembly rights safeguarded in the First Amendment." Id. at 38.  The legitimate concern set forth by the City to "provide for necessary traffic control and other aspects of public safety, [could] be no longer than necessary to meet the City's urgent and essential needs of this type." Id.  The "countervailing strength" of the First Amendment right of free speech and association prevailed.  Id. Accordingly, the thirty-day advance application violated the Constitution.  Id.

Like the City in Sullivan, Puerto Rico has a legitimate concern: the enforcement of campaign finance laws.  Act 51 narrows the registration window, however, by precluding submission of the Declaration of Organization and financial reports within five months of the referendum.  Arts. 6.1(c) and 6.1(j).  This is the timeframe in which voters are most engaged. See Jones, 530 U.S. at 586 ("Until a few weeks or even days before an election, many voters pay little attention to campaigns and even less to the details of party politics.") (Kennedy, J., concurring).

The June 5, 2020 deadline preserves the *status quo* by imposing multiple hurdles for additional participation and stifles spontaneous political expression. See Anderson v. Celebrezze, 460 U.S. 780, 791 (1983) (invalidating an early deadline for independent candidates, noting that "the major parties thus have the political advantage or continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process"); Missourians v. Klahr, 892 F.3d 944, 948 (8th Cir. 2018) (holding that a "formation deadline [making] it unlawful to form a campaign committee within 30 days of the election" violated the First Amendment).

### b. Government Endorsement of the Main Representative

The plaintiffs argue that the "power granted to the CEE to choose a [main] representative" vitiates the freedom of speech. (Docket No. 13 at p. 23.)  They maintain that "by entitling a particular party or group the right and/or power to represent an alternative," article 6 "grants a favorable sanction to whoever is selected in that respect in the eyes of the voters." Id. at p. 26.  The Court agrees.

Generally, the judiciary is "deeply averse to state laws, regulations, and schemes that threaten political

associations by favoring one association — or political party —
over others." Hand v. Scott, 285 F. Supp. 3d 1289, 1297 (N.D.
Fla. 2018).  The main representative is a government sanctioned
speaker for the Yes and No alternatives, more so because Act 51
provides no definition for this position.  When the legislative
branch "uses a term in the statute and does not define it, we
generally assume that the term carries its plain and ordinary
meaning." City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir.
2020).  The word "main" is defined as "chief" or "principal."  A
"representative" is, *inter alia*: "one that represents a
constituency or as a member of a legislative body," or "a typical
example of a group, class, or quality."  To "represent" is "to
bring clearly before the mind," or to "serve as a sign or symbol."[17]
Accordingly, the term "main representative" is the chief symbol of
the Yes or No alternatives.  Because the certification scheme in
Act 51 favors the established political parties, the "main
representative" is a proxy for these organizations.  See Act 51
§ 6.1.

Government endorsement of political parties is
disconcerting.  See, e.g., Anderson, 460 U.S. at 801 (striking a

---

[17] See Merriam Webster Online Dictionary, "Main" Definition, (available at
https://www.merriam-webster.com/dictionary/main); "Representative" Definition,
(available at https://www.merriam-webster.com/dictionary/representative);
"Represent" Definition, (available at https://www.merriam-
webster.com/dictionary/represent) (last visited Sept. 24, 2020).

state law that "[amounted] to a desire to protect existing political parties from competition"); Elrod v. Burns, 427 U.S. 347, 362 (1976) ("Care must be taken not to confuse the interest of partisan organizations with governmental interests."). Moreover, attempts by government officials "to disfavor certain subjects or viewpoints" are suspect. Citizens United, 558 U.S. at 340 (citing First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 784 (1978) (holding that when "the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended.")). The endorsement need not be explicit to violate the freedoms of speech and association. See, e.g., Williams v. Rhodes, 393 U.S. 23, 32 (1968) (striking an Ohio law that required the Socialist Labor Party to obtain 15% of the number of ballots case in the previous election to present a candidate, but only 10% from the Democratic and Republican parties).

Rosado and Vélez cite Hernández-López, 38 F. Supp. 2d 70, for the proposition that the "certification process is compatible with the First Amendment." (Docket No. 28 at p. 9; Docket No. 35 at p. 4.) This precedent is inapposite. The Puerto Rico government subsidized the 1998 referendum campaign. 38 F. Supp. 2d at 75. Certified representatives were

responsible for "[engaging] intensely in interactive communication with the public in order to arouse interest in the referendum itself and to persuade voters that their particular option is deserving of their support." Id. at 72.  An organization alleged that Puerto Rico violated the First Amendment because it required applicants to "possess a juridical personality at the moment the law was approved and [have] a recognized and public history of defense of that option involved." Id. at 73.  The Hernández-López court rejected the organization's argument, holding that it was "not unreasonable for the Commonwealth, which [was] funding the certified organization's political activity, to require that it have previously been a standard bearer of the political ideology it seeks to represent." Id. at 75.

Unlike the 1998 referendum law, Act 51 does not allocate public funds to the main representatives. Section 7.1(a) of Act 51 is entitled "Lack of Public Funding Obligations."  This section provides that "[e]very political party, party by petition, citizen group, political committee, and natural or juridical person that participates in canvassing activities during the plebiscite's campaign shall defray campaign expenditures from their own financial resources." Act 51 § 7.1(a). In fact, the statute mandates political impartiality.  According to the Declaration of Public Policy, funds for the referendum are

for the "objective, nonpartisan voter education options that would resolve Puerto Rico's future political status." Id. § 1(h) (citing Pub. L. 113-76 (2014)).  The CEE chairperson, a "nonpartisan figure," is required to "[coordinate] the education and electoral aspects of the plebiscite."  Id. § 3.2.  Act 51 provides for a "strictly objective and nonpartisan mass voter education campaign," including dissemination of a sample ballot.  Id. § 4.5(a), (b).  Consequently, the state interest that justified the main representative requirements in 1998 (i.e., oversight of government funded activities) is absent from this action.

> ### 3.    Justification for First Amendment Restrictions

Puerto Rico need not furnish "elaborate, empirical verification of the weightiness of [its] asserted justifications" for the Act 51 regulations. Cool Moose Party v. Rhode Island, 183 F.3d 80, 88 (1st Cir. 1999).  The defendants offer no countervailing state interests, however, to sustain the infringements on free speech and association.  There is no substantial relation between article 6 and a "sufficiently important governmental interest."  Citizens United, 558 U.S at 336-67 (citation and quotation omitted); see, e.g., Barker v. Wis. Ethics Bd., 841 F. Supp. 255, 262 (W.D. Wis. 1993) (issuing a permanent injunction precluding Wisconsin from enforcing an election law preventing lobbyists "from volunteering personal

services to political associations" because the state lacked a

valid justification for the limitation).  Accordingly, article 6

is unconstitutional.

## VI.  Section 7.1(d)

The plaintiffs assert that Section 7.1(d) violates the First

Amendment.  (Docket No. 13 at pp. 29-30.)  This section, which

limits the amount of money that natural persons may contribute to

the referendum campaign, provides that:

> Every contribution in cash or in kind for purposes of
> the plebiscite's campaign shall be for a maximum of two
> thousand eight hundred dollars ($2,800) per natural
> person.  This maximum contribution shall be independent
> from that authorized by law for political parties and
> candidates in the General Election year.  Such
> limitation shall apply to contributions made to
> political parties certified as main representatives of
> each of the two (2) options, as provided in Section
> 6.1(a) of this Act.  Entities regulated by federal
> statutes and/or regulations, which are not under the
> under the jurisdictional of Act No. 222-2011, supra,
> shall adhere to said federal statutes and/or
> regulations, the limitations imposed herein
> notwithstanding.

Act 51 § 7.1(d).  The $2,800 contribution limitation has First

Amendment implications.  As the Supreme Court has stated, imposing

a maximum "amount of money a person or group can spend on political

communication during a campaign necessarily reduces the quantity

of expression by restricting the number of issues discussed, the

dept of their exploration, and the size of the audience reached."

Buckley, 424 U.S. at 19.

The campaign finance law "has been based in large part on [the] distinction between contributions and expenditures." Colo. Republican Fed. Campaign Comm. FEC, 518 U.S. 604, 635 (1996). A contribution is a campaign donation that "[passes] through an intermediary – some individual or entity responsible for organizing and facilitating the dissemination of the message." Id. at 638. (Kennedy, J, dissenting). In contrast, expenditures are generally funds that finance "independent" campaign activities "made by a supporter completely on his own, and not at the request or suggestion of the candidate or his agent." McConnell v. FEC, 540 U.S. 93, 222 n.99 (2003) (internal quotation marks omitted).[18] Restrictions on expenditures are subject to strict scrutiny, while contributions trigger a "heightened or 'closely drawn" scrutiny." Id. at 134. Accordingly, for Act 51 to pass constitutional muster, the defendants must set forth a sufficiently important interest that is closely drawn to the $2,8000 contribution limitation. See Buckley, 424 U.S. at 25.

---

[18] Expenditures include "[a]ny payment of money, contribution, or anything of value, including but not limited to pledges, advances, and guarantees." Laws P.R. Ann. tit. 16, § 621(33). The Campaign Financing Act also differentiates between "campaign expenditures, coordinated expenditures, excess expenditures, and independent expenditures or uncoordinated expenditures." Id. § 621(34)–(37).

Contributions include the "donation of anything of value, but not limited to, the payment or refund of administrative expenses, wages, bonuses, gifts, utilities, equipment, supplies, and services, as well as pledges, advances, or guarantees to a political party, aspirant, candidate, or the campaign committee, or authorized agent, representative, or committee thereof. Id. § 621(23)(a).

Courts have upheld contribution limitations in campaigns for public office to prevent *quid quo pro* corruption or its appearance. See Republican Nat'l Comm. v. FEC, 619 F.3d 410, 429-31 (5th Cir. 2010) (holding that contribution limits do not violate First Amendment rights because they prevent corruption in candidate campaigns); Buckley, 424 U.S. at 33 ("[Congress has a] valid interest in encouraging citizen participation in political campaigns while continuing to guard against the corrupting potential of large financial contributions to candidates.")  The threat of "corruption perceived in cases involving candidate elections[, however,] simply is not present in a popular vote on a public issue." Bellotti, 435 U.S. at 790 (invalidating a state law prohibiting corporations from making expenditures or contributions in a referendum).  Essentially, "[r]eferenda are held on issues, not candidates for public office." Id.

In Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, the Supreme addressed a statute similar to section 7.1(d) in Act 51.  545 U.S. 290 (1981).  A municipal campaign finance statute provided that:

> No person shall make, and no campaign treasurer shall
> solicit or accept, any contribution which will cause the
> total amount contributed by such a person with respect
> to a single election in support of or in opposition to
> a measure to exceed two hundred and fifty dollars ($250).

Id. at 292.  The municipality cited corruption and the preservation

of voter confidence as justifications for the contribution

limitation.  Rejecting this argument, the Supreme Court noted that

unlike campaigns for public office, "special interest groups

[cannot] 'corrupt' the initiative process by spending large

amounts of money to support or oppose a ballot measure."  Id. at

293.  Consequently, it struck the provision as unconstitutional

because it "[did] not advance a legitimate governmental interest

significant enough to justify its infringement of First Amendment

rights."  Id.

Like the statute in Berkeley, section 7.1(d) imposes a

contribution limitation in a ballot issue election.  The referendum

will determine whether the people of Puerto Rico support statehood,

not whether a candidate is elected to public office.  The risk of

corruption does not constitute a sufficiently important government

interest.  See Legacy Alliance, Inc. v. Condon, 76 F. Supp. 2d

674,678 (D.S.C. 1999) ("Because the risk of corruption of a

candidate does not exist as to ballot issues, even limitations on

contributions cannot survive the necessary exacting scrutiny in

such campaigns."); R.I Affiliate v. Begin, 431 F. Supp. 2d 227,

244 (D.R.I. 2006) (noting in *dicta* that the "Supreme Court's decision in <u>Berkeley</u> casts grave doubt on the constitutionality of the dollar limits on the amounts that may be contributed with respect to ballot measures, especially when different limits are established for different categories or contributors").

The defendants argue that the "Plaintiffs are not barred from engaging in referendum-related expenditures and to make contributions in favor of the alternatives that they wish to support." (Docket No. 28 at p. 2; Docket No. 35 at p. 26.) This argument conflates expenditures with contributions without addressing the plaintiffs' claim that "the state cannot impose monetary limits on how much a person contributes and/or decides to [spend] in his or her right to express ideas." (Docket No. 13 at p. 29.) Because the defendants fail to identify a sufficiently compelling government interest that is closely tailored to the contribution limitation, section 7.1(d) is unconstitutional.

## VII. The Permanent Injunction Factors

Every equitable consideration weighs in favor of the motion for permanent injunctive relief.

### A.   Success on the Merits

For the reasons set forth above, the plaintiffs succeed on the merits.

**B.   Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Asociación de Educación Privada de P.R. v. García-Padilla, 490 F.3d 1, 21 (2007) (quoting Elrod, 427 U.S. at 373). Consequently, the plaintiffs have established that the restrictions in article 6 and sections 7.1(d) and 8.3(a) have inflicted irreparable harm. See, e.g., Diva's Inc. v. City of Bangor, 21 F. Supp. 2d, 60 (D. Me. 1998) (granting a motion for a permanent injunction because a municipal ordinance "resulted in irreparable harm to Plaintiffs by depriving them of . . . their right to free speech").

**C.   Balance of the Respective Hardships**

The hardship imposed on plaintiffs is grave. Obstructing the right to advocate in the referendum is "contrary to the fundamental principles underlying the First Amendment as the guardian of our democracy." Brown v. Hartlage, 456 U.S. 45, 60 (1982).

Vélez and Rosado argue that injunctive relief is inappropriate because Puerto Rico has "proceeded with the referendum preparations and calling into question [Act 51] at this late stage, would be disruptive and prejudicial." (Docket No. 28 at p. 7.) The CEE, Office of the Electoral Comptroller, and other agencies have "spent an inordinate amount of financial and human

resources to train, establish procedures and prepare for the upcoming referendum." <u>Id.</u>  Their arguments posit that an injunction will inhibit government authorities from holding the referendum.

The Severability Clause in section 8.6 provides, however, that

> [i]f any clause, paragraph, subparagraph, sentence, word, letter, [or article] or part of this Act were held to be null or unconstitutional, the ruling or holding, or judgment to such effect shall not affect, impair, or invalidate the remainder of this Act.  The effect of said holding shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, [or article] or part of this Act thus held to be null and unconstitutional.

Act 51 § 8.6.  This severability clause is "probative of legislative intent," exhibiting "settled principles of federalism and separation of powers." <u>Ackerley Communs. v. City of Cambridge</u>, 135 F.3d 210, 215 (1st Cir. 1998).  The governing question is: "Can the unproblematic parts of the statute be saved, or has the court's ruling so gutted the statute that it cannot go into effect at all?"  <u>Pharm. Care Mgmt. Ass'n v. Me. Attorney Gen.</u>, 324 F. Supp. 2d 74, 78 (D. Me. 2004).

The sole provisions subject to the permanent injunction are article 6 and sections 7.1(d) and 8.3(a).  (Docket No. 13.) The remaining sections of Act 51 are extraneous to this action,

falling beyond the purview of the motion for injunctive relief. The unconstitutional sections share a common trait: each provision places external constraints on the public.  Pursuant to Act 51, the referendum campaign shall include a main representative, individuals cannot contribute more than $2,800, and litigants seeking to challenge the statute must appear before the Puerto Rico Supreme Court.  Act 51 §§ 6, 7.3, 8.3(a).  These restrictions are tangential to the responsibilities of the CEE and Office of the Electoral Comptroller.

The "overseeing authority" and enforcement mechanisms remain intact.  The statute incorporates the Campaign Financing Act, a comprehensive disclosure and reporting regime. Id. § 1.5; see Laws P.R. Ann. tit. 16, §§ 621—64.  The CEE chairperson retains the responsibility for "organizing, structuring, directing, and supervising the [Commission] and all election-related processes." Laws P.R. Ann. tit. 16, § 4012.  Moreover, the referendum is not contingent on the appointment of a main representative. Section 6.1(c) states that the election will proceed without a main representative "if no certification for representation, alliance, or coalition of any kind has been issued."

Vélez argues that "[b]y the time Plaintiffs filed the instant action the referendum campaigns were already in place and advertisements have been scheduled in favor and in opposition of

the alternatives." (Docket No. 28 at p. 7.) This proposition is a *non-sequitur*. Political campaigns are dynamic affairs, not static fixtures in public debate. Advertisements that deviate from preconceived expectations do not impede the election. On the contrary, the referendum campaign is enhanced by additional participation and a diversity of perspectives. Accordingly, the balance of the respective hardships militates in favor of injunctive relief. See, e.g., Firecross Ministries v. Municipality of Ponce, 204 F. Supp. 2d 244, 251 (D.P.R. 2002) (Pieras, J.) ("[I]nsofar as hardship goes, the balance weighs heavily against Defendants, since they have effectively silenced Plaintiff's constitutionally protected speech.").

### D.  Inadequacy of Legal Remedies

Legal remedies are insufficient to address the deprivation of constitutional freedoms. Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011). A permanent injunction is a suitable remedy to restore the right of free speech and association. See Nat'l People's Action v. Vill. of Willmette, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages."). Consequently, legal remedies are inadequate to compensate plaintiffs for the loss of free speech.

E.   Pubic Interest Public Interest

The protection of free speech and association is "always in the public interest." ACLU v. Álvarez, 679 F.3d 583, 590 (7th Cir. 2012) (citation and quotation omitted).   Accordingly, the permanent injunction preserves the public's interest in protecting First Amendment rights.

## VIII. Scope of Injunctive Relief

Because article 6 and sections 7.1(d) and 8.3(a) are incompatible with the First Amendment, the Court must "tailor the scope of the remedy to fit the nature and extent of the constitutional violation." Ostergren v. Cuccinelli, 516 F.3d 263, 389 (4th Cir. 2010) (quoting Dayton Bd. of Educ. v. Brinkman, 443 U.S. 406, 420 (1977)).  Facial challenges are inherently disfavored because they "rest on speculation," "raise the risk of premature interpretation of statutes on the basis of factually barebones records," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Hightower, 693 F.3d at 76—67 (quoting Wash. State Grange, 552 U.S. at 450-51 (citation omitted)).

The constitutional defects in article 6 and sections 7.1(d) and 8.3(a) are pervasive.  For instance, elimination of individual

sections in article 6 cannot salvage the statute.   Article 6 elevates the main representative in relation to campaign participants without a "sufficiently important government interest" to "reflect the seriousness of the actual burden on First Amendment rights." Doe v. Reed, 561 U.S. 186, 196 (2010) (citation and quotation omitted).

The Court is cognizant of the "need to act with proper judicial restraint when intruding on state sovereignty." N.C. v. Covington, 137 S. Ct. 1624, 1626 (2017).   The violations of the First Amendment do not, however, withstand exacting scrutiny. "The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference." N.Y State Bd. of Elections v. López-Torres, 552 U.S. 196, 208 (2008)).   The people of Puerto Rico are entitled to engage in political discourse regarding the referendum without sacrificing their First Amendment freedoms.

## IX.  Security Bond

Plaintiffs ask the Court to waive the preliminary injunction bond requirement.   (Docket No. 13 at pp. 32–33.); see Fed. R. Civ. P. 65(c).   Because the Court has consolidated the motions for preliminary and permanent injunctions, the request to waive the preliminary injunction bond requirement is moot.   Forest Park II

v. Hadley, 336 F.3d 724, 734 (8th Cir. 2003); Quad-City Cmty. News

Serv., Inc. v. Jebens, 334 F. Supp. 8, 18 (S.D. Iowa 1971).

## X.   Conclusion

For the reasons set forth in the Opinion and Order entered
today, judgment is entered as follows. (1) The plaintiffs' request
for permanent injunctive relief, (Docket No. 13,) is **GRANTED IN
PART AND DENIED IN PART.**   (2) Francisco Rosado-Colomer in his
capacity as Chairman of CEE and Walter Vélez in his capacity as
Comptroller of the Office of the Electoral Comptroller are
**PERMANENTLY ENJOINED** from enforcing, in Act 51, article 6,
section 7.1(d), and the portion of section 8.3(a) requiring
challenges to be brought in the Puerto Rico Supreme Court. (3)
The motions for a temporary restraining order and for preliminary
injunctive relief, (Docket Nos. 12-13,) are **VACATED AS MOOT.**   (4)
The defendants' motions to dismiss, (Docket Nos. 27, 33,) are
**GRANTED IN PART AND DENIED IN PART.**   (5) All causes of action
against the Commonwealth of Puerto Rico, the CEE, and the Office
of the Electoral Comptroller are **DISMISSED WITHOUT PREJUDICE.**   (6)
The claims made directly pursuant to the Federal Constitution
against Rosado and Vélez in their official capacities are **DISMISSED
WITH PREJUDICE.**   (7) The claims made directly pursuant to the
Puerto Rico Constitution against Rosado and Vélez in their official
capacities are **DISMISSED WITHOUT PREJUDICE.**   (8) The claims

pursuant to section 1983 and directly pursuant to the Federal Constitution against Vélez and Dávila in their personal capacities are **DISMISSED WITH PREJUDICE.** (9) The claims directly pursuant to the Puerto Rico Constitution against Vélez and Dávila in their personal capacities are **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

Judgment shall be entered accordingly.

San Juan, Puerto Rico, September 24, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE